Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

---------------------------------------------------------

CYNTHIA D'ABADIE,

                                         PLAINTIFF,

VS.                NO. 4:18-cv-356-JM

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT,

                                     DEFENDANT.

---------------------------------------------------------

---o---

DEPOSITION

OF

CYNTHIA D'ABADIE

---o---

THURSDAY, MAY 30, 2019

---o---

EXHIBIT
14

A P P E A R A N C E S:

    ON BEHALF OF PLAINTIFF:

        JOHN WALKER, ESQUIRE
        JOY SPRINGER, Administrative Assistant
            John Walker Law Firm
            1723 South Broadway Street
            Little Rock, Arkansas  72206

    ON BEHALF OF DEFENDANT:

        W. CODY KEES, ESQUIRE
            Bequette and Billingsley
            425 West Capitol Avenue
            Suite 3200
            Little Rock, Arkansas  72201

---o---

1  was Jeff?

2  A     No.  It's my belief that he did that.

3  Q     Based on what?

4  A     Based on the fact that I was told Danny had

5  been disciplined for the day care incident, and based

6  on the fact that I was told in August or early

7  September of '16 that it had went all the way to the

8  top, wouldn't happen again.  I could not imagine that

9  Danny would have gotten in trouble for raising the

10  cooling on four units serving a cafeteria, and then

11  turn around six months later and do an entire school.

12  That did not make sense to me.

13  Q     Well, why didn't you check the key strokes like

14  you had done the prior times?

15  A     Because we have a software that doesn't track

16  key strokes.  The software that keeps global commands

17  does not track key strokes.

18  Q     Who has access to that software?

19  A     At the time there was about four or five of us.

20  It was Butch Camp, myself, Mr. Holder, Jeff Lynch,

21  Danny Bryan.

22  Q     So, February 27 of 2017, somebody used a global

23  command software?

24  A     We work out of two softwares.  One is a simple

25  kind of interface, the other is more technical.  And

1   the more technical one that you do a lot of your --

2   the higher level functions, that is the one where we

3   can execute global commands, and that is the one that

4   does not track key strokes, that I'm aware of.

5   Q     Global command software --

6   A     It's AXI Expert is the software.

7   Q     -- has no key stroke.  What is that called, you

8   can't -- you can't go back and determine who the key

9   strokes were done by?

10  A     Right, correct.

11  Q     Whatever that word would be.  Who had access to

12  the global command software?  You?

13  A     It was myself.

14  Q     Danny Bryan?

15  A     Danny Bryan, Jeff Lynch, Butch Camp.

16  Q     And Jerry Holder?

17  A     And Mr. Holder would have still -- yes, he was

18  still there.

19  Q     So, you saw in February that, using the global

20  command software, the heat set point had been lowered

21  at the entire College Station Elementary School, I

22  think you said, roughly two degrees from the --

23  A     From standard.  Standard was 70.  So, 68.

24  Q     And based on the fact Danny Bryan had

25  previously been disciplined for doing something

1   similar --

2   A      To one area, correct.

3   Q      -- to one area, you then surmised that it must

4   have been Jeff Lynch that did this?

5   A      Well, that and the fact that on at least two

6   occasions Jeff Lynch had indicated to me that the

7   people at College Station didn't deserve shiny new

8   buildings, they didn't pay their fair share of

9   property taxes.  We were in conversations about new

10  construction, new buildings.  I believe the first

11  time he mentioned it to me, I was quite shocked.  I

12  had never heard anyone say anything like that before.

13  Because when you say "the people", the people

14  includes the children.  So, you are, in effect,

15  saying the children don't deserve new buildings.

16  Those are the people that are occupying the new

17  school buildings.  On another occasion, he repeated

18  it.  So, on a subsequent occasion, I was able to try

19  to reason, I thought, or provide my viewpoint on it,

20  which I don't share that viewpoint.  I don't feel

21  that -- I feel all children should have equal

22  facilities that are equally comfortable, put them all

23  on a level playing ground as much as possible so that

24  they all have an equal opportunity.  So, between the

25  fact that Danny had supposedly just been disciplined

1    and the fact that Jeff Lynch had made the comments

2    about the people not deserving -- the people at

3    College Station not deserving shiny new facilities,

4    it seemed to me it was likely he was the person that

5    did it.

6    Q    That's it?  That's all the information you

7    relied on?

8    A    I believe so.

9    Q    Okay.  Now, these are the only -- have we

10   discussed all the incidents where you believe you

11   made issues known to your supervisors that was part

12   of subsequent retaliation?

13   A    So, are you saying beyond these three?

14   Q    Well, we also talked about comments Mr. Lynch

15   made about College Station and the taxpayers not

16   paying their share of taxes for shiny new buildings,

17   and you talked about Danny Bryan making racially

18   charged statements on several occasions.  So, I want

19   to know anything else that you heard or were

20   subjected to that you reported prior to your

21   nonrenewal.  Is that clear?

22   A    One other thing I did report that's a little

23   separate from these issues was the inappropriate

24   things Danny was viewing on his computer, which is

25   what Mr. Brewer testified to, which is in the

1    transcript.

2    Q      Yes.  That's where you saw Mr. Bryan viewing

3    female anatomy?

4    A      Yes.

5    Q      And he said it was National Geographic or

6    something?

7    A      Some sort -- something along -- it appeared to

8    be something along those lines.

9    Q      Okay.  So, that had nothing to do with race?

10   A      No.  Well, you asked what other things that I

11   know about --

12   Q      No, no.  I know.

13   A      -- that I had reported.

14   Q      I appreciate it.

15   A      And that, when Brewer was asked, if I'm

16   thinking correctly, what was the basis of my hostile

17   workplace complaint, he indicated that it was sexual

18   harassment.  I did report there was inappropriate

19   viewing, and I certainly didn't like it.  But

20   children and what happens to children is far more

21   important to me than something like that.

22   Q      Okay.  Now, did Mr. Bryan -- or did anyone in

23   the district ever make advances toward you, sexual

24   advances?

25   A      No.

1    Q      So, the totality of any sexually adverse

2    interactions, for lack of a better phrase, at PCSSD

3    comes in the way of Mr. Bryan viewing this

4    inappropriate material on the computer?

5    A      Yes.

6    Q      And then, you reported that to who?

7    A      I reported that to Jeff Lynch.  I also reported

8    -- I'm glad you asked these questions, because I

9    almost forgot.  I reported to Jeff Lynch in 2016 that

10   a woman by the name of Laverne Dunick, who cleaned

11   our offices at Plant Planning on Fridays, that Ms.

12   Dunick had indicated at another PCSSD facility she

13   was subjected to another employee that printed off

14   like an Afro image and taped it to her broom handle

15   or mop handle, and she told me how much that upset

16   her, and that the employee that did it was with

17   another employee and they were laughing about it.

18   She told me and I did report that to Jeff Lynch in

19   '16.  But I don't know what happened after I reported

20   that.

21   Q      Okay.  All right.  Now, have we discussed all

22   of the issues or encounters that you had that you

23   reported to your superiors prior to --

24   A      Everything I can think of.

25   Q      Okay.  As we sit here?

1           MR. WALKER:  Let me go off the record

2  so you won't be confused.

3           (WHEREUPON, a discussion was held off

4  the record.)

5           MR. WALKER:  I'm back on the record.

6           THE WITNESS:  Yes.  I did tell him that

7  Mr. Brewer indicated that at the School

8  Board hearing.

9           MR. WALKER:  I was thinking it was

10  before the School Board hearing in a meeting

11  where he was present.

12           THE WITNESS:  Oh, yes.  Mr. Brewer --

13  yes.  I had met with Mr. Brewer in August of

14  '16 where I informed him of the -- what had

15  happened with the set points.  Of course,

16  College Station came later.

17  BY MR. KEES:

18  Q     Right.

19  A     But what had happened with Doctor Bell and with

20  the day care, and of Danny's racist comments and that

21  sort of thing.  We talked about that.  And so, he

22  asked me to write a narrative, which I did.  And I

23  sent him a couple of e-mails to kind of substantiate

24  our conversation that we had in August of '16.

25  Q     And, in fact, Mr. Bryan was disciplined;

1    correct?

2    A     That's my understanding.

3    Q     And, in fact, the district hired an attorney

4    that investigated your complaints, did they not?

5    A     I don't know anything about that.

6    Q     Do you not remember meeting with Whitney Moore?

7    A     Oh, okay.  To investigate -- I guess, to

8    represent them, is that what you mean, the same

9    thing?

10   Q     No.  My understanding was she conducted an

11   investigation and you were involved in that.

12   A     Okay.

13   Q     Do you remember meeting with Whitney?

14   A     Yes.  That was the meeting I told you where

15   Danny had said -- okay.  I wasn't sure if that was

16   her -- an investigation or her representing the

17   district.  You are saying it was an investigation?

18   Q     No, I'm not asserting anything.  I'm asking, do

19   you recall being part of questioning related to your

20   concerns?

21   A     Yes.

22              MR. WALKER:  Let's stipulate for the

23         record that there is no evidence that they

24         hired a person to investigate this.  If

25         there is such an investigation report, we

1    would like to have it.

2         MR. KEES:  You are the one that just

3    told me about the investigation.

4         MR. WALKER:  No.  What they did was,

5    they looked into it, but this was not a

6    separate, private, independent investigator.

7    That's what I thought you were talking

8    about.

9         MR. KEES:  Well, I'm not putting words

10   in your mouth.

11        MR. WALKER:  Okay.

12   BY MR. KEES:

13   Q    I'm asking, were you aware of --

14   A    My awareness, when I was called to meet with

15   Whitney was, my thoughts were she was representing

16   the district and that she was trying to gather

17   information about what happened.

18   Q    Okay.

19   A    And that was in May of '17.

20   Q    Okay.

21        MR. KEES:  Off the record.

22        (WHEREUPON, a discussion was held off

23        the record.)

24   BY MR. KEES:

25   Q    So, again, have we talked about everything you

1  reported to any supervisor regarding times that you

2  felt somebody was taking adverse action against

3  anyone based on their race that you reported prior to

4  your nonrenewal?

5  A      Well, I was telling you the conversations that

6  Jeff and I had actually, early on, soon after I

7  became employed about the behavior -- about Danny's

8  behavior.  And like I was telling you, I began to

9  notice patterns that I thought were racist patterns

10 in his work.  And we had those conversations.

11 Q      Y'all had those, who are you talking about?

12 A      Jeff Lynch and I.  In fact, Jeff said that

13 prior to my arrival in January of '15, that the

14 former Energy Manager, June Tallent, was constantly

15 getting onto Danny for using the "N" word.  So,

16 apparently it had been happening for some time prior

17 to my arrival.

18                  (WHEREUPON, a discussion was held off

19          the record.)

20                  MR. KEES:  We are back on.

21 BY MR. KEES:

22 Q      You said that you were told or you learned that

23 Mr. Bryan was disciplined.  How did you learn of

24 that?

25 A      So, Mr. Bryan, Jerry Holder, Mr. Brewer, and

1    Jeff Lynch had a meeting in late August that was

2    subsequent to my meeting with Mr. Brewer.  After they

3    met -- shortly after they met, Jeff and Mr. Holder

4    called me into the Plant Planning conference room

5    where Jeff indicated that my concerns had went all

6    the way to the top and that they would never happen

7    again.

8    Q     Mr. Brewer told you that?

9    A     No.  Jeff Lynch told me that.

10   Q     Okay.

11   A     And Mr. Holder was present.  Mr. Holder just

12   nodded his head.  I don't recall him speaking.

13   Q     And that was when?

14   A     That was in -- would have been late August,

15   maybe early September of '16.  These were the issues

16   that had happened at that time regarding Doctor Bell

17   and the day care.

18   Q     Okay.  And then, after that, you are not aware

19   of any other instances where Danny Bryan changed the

20   set points?

21   A     No, no.

22   Q     You know, wrongly?

23   A     Nothing happened until February of '17.

24   Q     And that was the issue with College Station?

25   A     Correct.

1    Q      Okay.  So, you have the conversation with Jeff

2    Lynch and Charles Blake.  That's February of 2017;

3    correct?

4    A      Correct.  Correct.

5    Q      Do you know if that was in or around the time

6    that you discovered this issue with College Station

7    set points?

8    A      I think it was before.

9    Q      What was before?

10   A      The conversation with Jeff and Mr. Blake, when

11   they met with me, I think that that was prior to my

12   discovering the heat set points had been lowered.

13   Q      All right.  And you told him -- I remember you

14   said earlier that you told Jeff Lynch at this

15   February meeting that you felt like you were part of

16   a hostile workplace?

17   A      I felt -- when he said that my position was

18   being considered to be cut, I immediately said, "This

19   is hostile, this is retaliatory."  And I repeated

20   myself probably two or three times.

21   Q      Why did you think it was retaliatory?

22   A      I felt it was retaliatory based on the

23   reporting of Doctor Bell and the day care, and that I

24   had told Jeff at that time I felt like it could have

25   been a racial move by Danny, because we had had that

1    A      Okay.

2    Q      Let's just accept that as true.

3    A      Okay, that that's true.

4    Q      Is that all that we know about his involvement,

5    is that he may have known about your complaint?

6    A      I can't know what he knows.

7    Q      So, we don't have any other -- you have no

8    other evidence that he wanted to retaliate against

9    you, Mr. Guess -- Doctor Guess?

10   A      With Doctor Guess, I would say it's possible,

11   but I don't believe -- I don't believe he -- it's

12   possible, but I don't -- it's possible, but I really

13   don't think he was involved in that.  I don't.

14   Q      Why?  A gut feeling, or do you have anything to

15   base it on?

16   A      I just think that if he would have signed off

17   on some paperwork to cut my position, he was just

18   doing, you know, whatever Derek's recommendation was.

19   Q      Okay.  So, do you think this came from Derek?

20   A      I think it's possible it came from Derek and

21   Jeff.

22   Q      Derek and Jeff?

23   A      Primarily.  But I can't rule out that Doctor

24   Guess wouldn't have had knowledge of it and been a

25   part of it somehow because of their statement that it

1  Q     -- do you have any information that any of

2  those five knew anything besides what was presented

3  at the hearing?

4  A     Doctor Remley did.

5  Q     What did she know?

6  A     Because I e-mailed her in April of '17 about

7  the different incidences, and that I felt that it was

8  in response to me reporting what I had reported, that

9  it was connected to cutting my position.

10  Q     So, that's after you had received the

11  nonrenewal?

12  A     Correct.

13  Q     Did she respond?

14  A     No, she did not.

15  Q     Do you have any evidence that she got the

16  e-mail?

17  A     I didn't get a Mailer Daemon Failure Notice.

18  Q     A what?

19  A     A Mailer Daemon Failure Notice.

20  Q     A domain --

21  A     When someone doesn't get an e-mail, usually you

22  get a response back that the recipient did not

23  receive it.  I did not receive such a notice.

24  Q     Did you ask for a read receipt?

25  A     No.

1   Q      Has Doctor Remley ever even told you that she

2   -- has she ever told you she got it?

3   A      She never contacted me, she never responded, no

4   phone call, no e-mail.

5   Q      Okay.

6   A      But that's the culture of the district.  They

7   often don't.  You send e-mails and they don't

8   respond.

9   Q      Why are you still there?

10  A      Because I love the kids, I love my job, I love

11  my co-workers.

12  Q      So, you love your job, your kids, the

13  co-workers.  You don't like the culture?

14  A      The culture is, when you send an e-mail, they

15  very often do not respond to it.  And it can be --

16  for example, when I sent the e-mail on March 3rd to

17  Derek and then forwarded that e-mail to other

18  recipients, I never heard from anyone except for

19  Doctor Warren.  I reported something that I felt was

20  shocking that someone would want to get back with me

21  and say, "Help me learn why is this important to you,

22  why is" --

23  Q      Remind me of the March 3rd e-mail.

24  A      What?

25  Q      Remind me of the March 3rd.  What date?