IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CYNTHIA D'ABADIE                                                                    PLAINTIFF

v.                              Case No. 4:18-cv-00356-JM

PULASKI COUNTY SPECIAL SCHOOL DISTRICT                    DEFENDANT

**Plaintiff's Response Brief to Defendants'**
**Brief in Support of its Motion for Summary Judgment**

I. Introduction

This white female's good faith belief that federal law made frequent use of the "N" word in the workplace unlawful is the initial precipitating reason for this case being brought before the Court. Plaintiff, a white female, reported to management that a co-worker who did just that only to later learn that management from the district's lowest to its highest levels was complicit through its own racial conduct toward African American staff and that it was retaliatory toward her because she exposed management's direct racial conduct as well. Because of her complaints, herein, district management took her job. *See Plaintiff's Statement of Material Facts. See also Def. Statements of Undisputed Material Facts 14, 16-19 and 22 that support Plaintiff's Statement Material Facts.*

II. Factual Background

Cynthia D'Abadie, a white female, was dismissed from her job with the Pulaski County Special School District (District) because she made verbal and written complaints to management about a hostile work environment rife with

1

racial treatment against African American staff members by white staff members toward them who included supervisory personnel of the Plant Planning department and the district as a whole. The initial hostile treatment consisted of frequent racial references from a white staff member, Danny Bryan, in the presence of management, and of later treatment directed toward African American staff members by management including the district's senior leadership, i.e. Executive Director of Operations (EDO) Derek Scott, Interim Chief Executive Officer (CEO) Paul Brewer and D'Abadie's immediate supervisor, Plant Planning Coordinator Jeff Lynch. Her complaints followed the district's chain of command protocol. Plaintiff's initial complaints were supplemented by her in writing in July and August 2016 and January through March, 2017.

The district's response to plaintiff's claims to management of hostile work environment was to eliminate her position. *Defendant's Exhibit 6*. The district did not formally reprimand or punish any offender. The only semblance of punishment in the record is the verbal counseling reflected by Chief Executive Officer Brewer's admonition to Abadie's co-worker Bryan: "be careful what you say around blondes, especially pretty ones." Plaintiff is both.

Plaintiff's complaints concerned treatment of fellow African American co-workers who were being treated in a hostile, discriminatory manner. First, the African American staff were the subject of frequent use racial epitaphs and other adverse treatment by Danny Bryan. Bryan became complicit with EDO Scott and Supervisor Jeff Lynch to wreak harm and hardship upon African American staff at

three district schools: Daisy Bates, College Station and Sylvan Hills elementary schools. Those directives constitute direct evidence by pertinent district management officials of their intent to mistreat and harm African American staff and to further the hostility of the work environment.

Plaintiff was unaware of the complicity of Scott, Lynch and Bryan until about March, 2017. She concluded that Jeff Lynch had delayed addressing and advancing her hostile work environment complaints because he was complicit. Lynch contends that he delayed consideration of plaintiff's complaints because he had not been trained to address workplace complaints of unlawful discrimination. His explanation was an excuse to conceal his complicity with Scott regarding adverse treatment of African American staff. This is so because Lynch discouraged plaintiff from following through with her complaints, i.e., "leave it alone, Bryan will be retiring in about three years."

The complicity between Scott, Lynch and Bryan included, inter alia, Scott's instructions to Bryan to cause harm to a staff member he identified as a "black bitch;" to Lynch and Bryan to make a sick African American staff member "jump through hoops" in order to get a health accommodation; and to make an African American principal's work unbearable. While plaintiff's complaints were pending, she raised the standing concerns about pay that she was not receiving for overtime. Scott then threatened to outsource the work that plaintiff was doing and then to eliminate the job. The district does not attempt to defend, explain, nor deny Scott's

3

actions or motivations. Bryan's testimony confirms not only his role but the role of Scott and other management officials in the adverse treatment of plaintiff.

Upon plaintiff's persistence with her complaints of unlawful actions regarding African American staff, Scott decided to eliminate plaintiff's job as Energy Manager. Because her work was essential, he decided to terminate her, reinstate her into a different position and thereby teach her a lesson. Because he was angry that his complicity had been confirmed by Bryan. Scott treated Bryan somewhat similarly but not as harshly. Scott demoted plaintiff by creating a new job description and grade level, eight grades below her current position. Scott's actions were supported by CEO Brewer. According to Brewer, the positions of both Bryan and plaintiff were needed:

> Ans.: …… the consensus of that department was that they could cut the salary to a certain extent and redo the job description with a reduction. They had the opportunity to accept it or not accept. *Exhibit 7, Brewer Dep. p. 22, lines 20-25*

Scott's plan of action and Brewer's explanation reflect direct evidence of district's intent to retaliate against plaintiff for her complaints that they refused to address.

The pretext of the articulated nondiscriminatory reason for the district's adverse treatment of D'Abadie is further shown by the testimony of Dr. Jerry Guess, *Defendant's Exhibit 9, para 5*:

> "… during the 2016-17 school year, PCSSD had to make plans for the loss of desegregation funding…that would result in a loss of that money during the 2017-18 school year."

4

Guess's statement is not supported by any evidence. It is contradicted by the fact that the "allocations (RIF's) did not cut any job positions occupied by live staff other than plaintiff and Bryan. By the "allocations", the district simply chose not to fill positions which were already unoccupied. *Plaintiff's Exhibit 17.*

The district savings pursuant to the pay reductions for D'Abadie and Bryan are at most $20,000.00 for one year. A reasonable jury could view the amount of savings accomplished by plaintiff's treatment by the district in comparison to its treatment of retired employee, Jerry Holder, former Plant Planning Director. When Holder retired in June, 2015, he earned $100,000.00 or more. From 2015 through 2019, Holder continued to work. He had no written job description, defined duties and he worked as he pleased. *Plaintiff's Exhibit 6- Holder Dep. p. 8-11.* Holder continued to be paid by the district more than $50,000.00 each year. Plaintiff's work was viewed as essential. Holder's was not. Their comparative treatment demonstrates the falsity of the district's alleged budget cut necessity argument. Holder's pay for 2017 through 2019 for the two years was $100,000, five times each year the amount the district represents that it saved by downgrading plaintiff's job and cutting her pay.

## II. Summary Judgment Standard

The summary judgment standard is set forth in Rule 56 of the Federal Rules of Civil Procedure.

III. Argument and Authority

1.
Because Plaintiff Has Presented Direct Evidence That Reflects
The Intent of Management to Punish Plaintiff Because of Her
Timely Complaints of Unlawful Staff Discrimination and
Retaliation, Plaintiff is Entitled to a Trial by Jury.

Plaintiff has submitted "direct evidence" that illegitimate criteria motivated the adverse action that defendant took against her. *Griffith v City of Des Moines, 387 F. 3d. 733, 735 (8th Cir. 2004).* Her direct evidence is set forth in her Statement of Material Facts.

This is that rare case where the employer admits to having created a "hostile work environment" and of otherwise directing and tolerating racial discrimination against African American co-worker staff members of the plaintiff. Title VII prohibits both. Plaintiff, a white female, opposed continued use of hostile, derogatory racial epitaphs and other direct racial treatment of African American staff which was directed toward them by district management. She used the employer's internal complaint system to address her concerns. Management did not address plaintiff's internal complaints at first because the offending employee was three years from retirement. While her complaint regarding racial epitaphs and other adverse treatment against African American staff, attention to her work caused her to confront unusual circumstances with respect to African American staff co-workers. Plaintiff then added those concerns to her existing complaints of a hostile work environment. In due course, her offending co-worker, Danny Bryan, admitted that his was the responsible party for some of the adverse actions. Bryan

then "confessed" to plaintiff that his hostile conduct toward African American staff was because of directions from Derek Scott, Executive Director of Operations (EDO) for the Pulaski County Special School District (District) and the person second in management to the Superintendent, as well as Jeff Lynch, Coordinator of Plant Planning for the district. Bryan admitted, and the district does not deny that Scott and Lynch directed Bryan to take harmful action against African American co-workers on at least three occasions.  In the first instance, he was directed by Scott to engage intentional adverse action against a black staff whom Scott described as " that black bitch."  For another African American employee with a medical condition, Scott directed that she be made to "jump through hoops" over a period of time in order to obtain a medical accommodation.  For a third  example, Lynch directed Bryan to take adverse action against the African American school principal conducting inventory during the summer in his multi-purpose gym by increasing the cooling set points and to thereby cause the principal to be uncomfortable in the heat of the summer.  The proof of Scott' and Lynch's 'do harm' directions to Bryan are not contradicted.  This is direct evidence of prohibited discrimination.  *See Plaintiff Statement of Material Facts, 8-17*.

      Plaintiff's internal complaints were never addressed.  The admonishment by Chief Executive Officer  Brewer cannot be resolution of plaintiff's complaint, i.e. "be careful what you say around 'blondes', especially pretty ones."   The further response by Brewer and Scott was to list plaintiff and Bryan for termination of

employment, and then give them an opportunity to stay on with reduced pay under humiliating circumstances.

The described behavior of district management establishes close links in time  between plaintiff's internal hostile work environment complaints (January-March, 2017) and the district's decision to terminate her. (April, 2017). Thus, a reasonable jury could decide that plaintiff's hostile work complaints to management including complaints of which plaintiff was unaware at the time[1] and presented later, were generated by management itself. The jury could also conclude that "illegitimate criteria" "actually motivated the adverse employment action[2]" which plaintiff suffered.  *Griffith at page 735.*

Plaintiff's direct evidence of  defendant's intent to discriminate and retaliate is so strong that it shifts the burden to the defendant to present contrary evidence. That would leave for the jury the issue of whether plaintiff carried her burden of proof on the case as a whole.  This approach makes the *McDonald Douglas* framework unnecessary.  Plaintiff submits that this case should proceed to trial. *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000); Ginsberg concurred.*

---

[1] . Plaintiff EEOC Charge, Exhibit 20.
[2] . "Adverse action means to discharge, threaten or otherwise discriminate or retaliate against a public employee in any manner that affects the employee's employment, including compensation, job location, rights, immunities, promotions or privileges.  A.C.A § 21-1-602(1).

2.
### Plaintiff's Complaints Were Based Upon Her Good Faith Beliefs That Defendant Engaged in Unlawful Employment Practices Prohibited by Title VII of the 1964 Civil Rights Act.

In the event that the Court sees fit to apply the McDonald Douglas framework, Plaintiff submits and adopts by reference Argument 1, supra., for reference for the proposition that she has established a prima facie case of a hostile work environment and/or retaliation. First, plaintiff is a white female. White females, however, are not required to sit silently when their fellow African American co-workers are called names, harmed by management actions and treated differently from other employees in the workplace.

Plaintiff tolerated a co-worker's hostile racial epitaphs and other adverse treatment directed toward African American black staff to the point where her self-respect dictated that she file an internal complaint about that employee's racially tainted behavior. Her white supervisor, Jeff Lynch, refused to address her complaint because he, himself, was culpable in creating and maintaining the racially tainted work environment. For that reason, he advised plaintiff to endure the hostile treatment because defendant had three years or less before retirement.

Plaintiff later learned and timely reported that in addition to her direct supervisor, Jeff Lynch, the district's Executive Director of Operations, Derek Scott, was the source of the other and further intentional acts of adverse treatment of African American staff. As stated supra, both Derek Scott and Jeff Lynch were complicit with co-worker Danny Bryan. While African American students were also

9

harmed, plaintiff's complaint is not brought to address their treatment. Therefore, the cases cited by defendant, *Williams v. Lindenwood University, 288 F. 3rd 349, 355 (8th Cir. 2002) and Martinez v. W. W. Grainger, Inc., 664 F. 3rd 225, 230 (8th Cir. 2011),* do not apply.

Plaintiff has demonstrated that when she addressed her hostile work environment claims (a white female staff does not have to tolerate racial epitaphs any more than an African American staff member), added to them over time and persisted, she was subjected to retaliation within a context which satisfies the burden shifting framework of *McDonald Douglas v. Green, 411 U.S. 792 (1973).* Plaintiff's prima facie case consists of having engaging in the protected act of advocating for the elimination of racially discriminatory practices by the district adverse to African American co-workers; she was terminated; and she was rehired but with greatly reduced pay and grade, and ultimately given more work than before; and there is a time causal connection between these events because they occurred within a short period of time. *See Plaintiff's Material Facts No. 32.*

The practices that are set forth in Plaintiff's Statement of Facts include those practices in which she engaged that are protected by Title VII. They include her right to make a charge of a racially hostile work environment internally, advocating for change of the hostile work environment as it affected African American staff; and opposing practices made unlawful by Title VII. There is no contrary evidence.

The defendant cites *Wimmer v. Suffolk County Police Department, 176 F. 3rd 125, 135 (2nd Cir. 1999)* for the proposition that a plaintiff's complaint of retaliation

for opposing discrimination by co-employees against nonemployees is not cognizable under Title VII because statute only prohibits discrimination by employers, not co-employees. *Defendant's Brief at page 9.* Plaintiff submits that in her hostile work environment and retaliation claims, she was confronted by a co-employee in concert with management who directed adverse work conditions against African American staff prohibited by Title VII. Management actions are attributable to the employer. Management actions constitute intentional discrimination directed at African American staff and directed toward plaintiff because she caused management to have to address the issues.

Defendant argues that D'Ababie's activity is akin to the activity in *Artis v. Frances Howell N. Bank Booster, Ass'n, 161 F. 3rd 1178, 1183 (8th Cir. 1998).* There, *Artis* advocated on behalf of a black student whom *Artis* perceived as being treated differently from a white student. *Artis* claims that he was fired in retaliation for his advocacy on behalf of the student. The 8th Circuit dismissed *Artis's* case, it noted that *Artis* was not a district employee, that he worked for the booster club and that his advocacy was on behalf of a student, advocacy not authorized by Title VII.

In plaintiff's case, each actor is a staff member for the same employer. Plaintiff perceived that she was opposing practices made unlawful by Title VII of the 1964 Civil Rights Act. *Bakhtiari v. Lutz, 507 F. 3rd 1132, 1137-38 (8th Cir. 2007),* cited by the defendant is not inapposite. In that case, unlike plaintiff's case, there was no evidence, direct or circumstantial, showing a specific link between Bakhtiari and any alleged retaliatory practices prohibited by Title VII. The Court

11

cited *Griffith*. The Court further noted that under Title VII "a plaintiff's employee need not establish that the conduct that he opposed was in fact prohibited under Title VII; rather he need only demonstrate that he had a "good faith reasonable belief that the underlying challenged conduct violated Title VII." *Citing Buettner v. Arch Coal Sales, Co., 216 F. 3rd 707, 714 (8th Cir. 2000).* Viewing the evidence in its entirety, a reasonable jury could therefore conclude that plaintiff had a good faith reasonable belief that the conduct about which she complained was made unlawful by Title VII and that because she presented and persevered with her complaints, her job was eliminated. It could further find that plaintiff's treatment constituted a demotion in that she continued to perform the same work as before but was given a different title and pay grade and subjected to humiliation. *Plaintiff's Exhibit 1-D'Abadie Aff. para. 22; Plaintiff's Exhibits 9 and 11. See also Plaintiff's Exhibit 7-Brewer Depo. p. 22-23.*

3.
There is a Causal Connection Between Plaintiff's Good Faith Complaints and the Defendant's Decision to Adversely Affect Her Employment Status.

The complaints before the Court that plaintiff made to the district regarding the district's treatment of African American employees was based upon her good faith belief that the district's conduct was unlawful. *Buettner, at p. 714.* Plaintiff presented her complaints of unlawful treatment of African American staff through internal channels. On January 20, 2017, plaintiff complained that an American staff member with a serious medical condition was deliberately being harmed. She

believed that his treatment of the staff member was motivated by race. Her complaint ultimately reached Scott on March 3, 2017. It was also sent to CEO Brewer, to the Superintendent and ultimately to the school board president. *Plaintiff's Exhibits 13, 16 and 17.* By inference, during that time, the administration jointly decided to terminate plaintiff. This inference is valid because, on April 17, 2017, CEO Brewer hand-delivered to plaintiff notice of termination. Hand delivery of notice is unusual. *Def. Ex. 6; See also Plaintiff's Exhibit 7, Brewer Depo., p. 24-26.*

Because the district needed plaintiff's services, Scott created a scenario whereby he could punish plaintiff for her complaints and at the same time allow her to remain employed. Knowing that plaintiff needed her job, Scott gave her a take it or leave within a one-day option for a new job title Energy Management Systems Scheduler. *See Plaintiff's Ex. 1, D'Abadie Aff. para. 21.* Scott downgraded her previous position by eight pay grades with a more than $10,000 pay loss. His actions reduced her to the same grade level and job description as Danny Bryan. Bryan had fallen into disfavor with Scott because Bryan disclosed Scott's complicity with respect to plaintiff's advocacy regarding African American staff. Scott also punished Bryan but to a lesser extent than he punished plaintiff. Recall that Bryan's behavior had been initiated and condoned in the first place because he sought to please Scott by advancing Scott's racially motivated actions. Thus, when Scott terminated plaintiff and gave her the one-day option, he did likewise to Bryan. Scott's actions are undisputed. Scott justified his action by stating that both

plaintiff and Bryan were no longer essential to the program needs of the district. That Scott kept them on the payroll pursuant to different pay terms performing the same duties constitutes strong evidence that Scott's stated reason for plaintiff's discharge was pretextual. A reasonable jury could so find. *See Plaintiff Exhibit 1- D'Abadie Aff. para. 21.*

Plaintiff has satisfied the prongs for making a prima facie case of retaliation under *McDonald Douglas,* if the Court so chooses to apply that analysis. (1) plaintiff was satisfactorily performing her job responsibilities; (2) she complained about work place discrimination which she believed unlawful under the Civil Rights Act and district policies; 3) within a brief period of time, after she complained, Scott gave her notice of termination; and (4) Scott magnified her termination by adding to her work load many of the duties and much of the work of her co-worker, Danny Bryan, who had exposed Scott's unlawful behavior toward African American staff.

Because plaintiff is now doing the same work for the district that she did before she was discharged due to her complaints of unlawful discrimination, it is more likely than not that a jury could conclude that "but for" her complaints that exposed the district's intent to harm African American staff, plaintiff would not have been terminated nor would she have suffered the residual treatment under which she now labors. *Plaintiff's Exhibit 1, para. 22.*

The cases cited by the defendant do not address plaintiff's satisfactory work performance before and during her complaints. Accordingly, a reasonable jury would not find that plaintiff would have been discharged anyway. *Wright v. St.*

*Vincent's Health Sys.*, 730 F 3rd 732, 737 (8th Cir. 2003); *Wilking v. County of Ramsey*, 153 F. 3rd 869, 873 (8th Cir. 1998).

To summarize, the causal connection evidence, plaintiff makes the following points: 1) The desire of the district to retaliate against the plaintiff is manifest by actions in concert over time, directed by and between Executive Director of Operations Scott, Chief Executive Officer Brewer, Plant Planning Coordinator Jeff Lynch, and plaintiff's co-worker Danny Bryan. When Bryan disclosed the adverse actions of management that ultimately lead to management's decision to terminate plaintiff's employment, Bryan became persona non grata with management. 2) Plaintiff's January, 2017 complaint that reached Scott in the chain of command on March 3, 2017 to which Scott did not respond was the point when Scott and Brewer met and decided to what to do with regarding plaintiff's continued employment. After they met, Brewer proceeded to <u>hand deliver</u> plaintiff's letter of termination on April 17, 2017. The inference to be drawn from this sequence of events is that Scott and Brewer determined between these two dates their course of action toward plaintiff. 3) Because plaintiff's job was necessary and she was performing it satisfactorily, Lynch argued for her retention. *See Plaintiff's Exhibit 5, page 15, 31*. Therefore, there is a strong inference that plaintiff would more likely than not have been retained and not discharged. The fact that she would not have been discharged is shown by the fact that she continued to do the same work as before, and that she took on many of Bryan's duties as well while Bryan was still on the payroll. *See Plaintiff Exhibit 1- D'Abadie Aff. para. 21, 24.*

4.
Defendant's Articulated Reason for its Employment Decision
is False.

The district argues that plaintiff was "non-renewed and then recalled into a new position as a part of a district-wide reduction to save money with the loss of desegregation funding." *Def. Brief, p. 15, para 1*. That reason differs from the reason stated to plaintiff. *Def. Exhibit 6*. This proffered reason is new, not supported by the record and is pretextual. First, plaintiff never left her job as Energy Manager and continued to perform them under a diminished job description, Energy Management Systems Scheduler. Second, the district did not engage in a district-wide reduction in staff for the 2017-18 school year. There is no proof by the district that it did.

The district's evidence on this point is set forth on page 16 of its brief and in Exhibit 9, the Affidavit of Dr. Jerry Guess. There was no Reduction in Force (RIF) of the staff as a whole during the 2017-18 school year. According to Superintendent Guess, the reduction in force occurred at the end of the 2015-16 school year. He further states that there were plans for further RIFs, but he does not say that they were actually implemented. *See Defendant Exhibit 9.* In order to establish that there was a RIF for the 2017-18 school year, the district could have presented its districtwide evidence showing a twenty-five (25%) reduction plan for the 2017-18 school year. That proof is absent. The proof is even lacking that 25% of the Plant

16

Planning staff itself were discharged. Only Bryan and plaintiff were discharged that year.

There is other evidence from which the jury could conclude that the district's asserted reason is false. Director of Plant Planning Jerry Holder retired at the end of the 2014-15 school year. He remained on the payroll for four years thereafter, being paid more than $50,000 per year, about half of his regular salary. He had no explicit duties nor a job description, kept his own hours, and worked when he pleased. His $50,000 annual salary is not accounted as an item to be addressed as a RIF. Surely, a district intent on reducing its budget would not have retained Holder after he retired, allowing him to work as he pleased without a specific job description.

That plaintiff, on the other hand, was recalled into the scheduler position is semantically impossible. One cannot be "recalled" into a position that neither existed nor was formerly held by that person. A reasonable jury could conclude that plaintiff kept the same job with a different name for it. <u>It was the same position with same work that she had formerly done</u>. "A rose any name is still a rose!"

The Holder example which shows infidelity to budget allows a reasonable jury to conclude that the district's 'plaintiff's job was terminated in order to save the district money' reason was false and pretextual. A district bent upon saving money by its staff reductions would not add an employee who had no written job duties or responsibilities while at the same time terminating and then recalling one who did but at pay far below her previous pay. As an aside, nor would it keep on its payroll

17

for <u>seven</u> years, 2012-2019 school years, as Interim, a CEO making more than $150,000 per year as it did with CEO Paul Brewer. A reasonable jury could conclude that the examples of Holder and Brewer demonstrate that the district was not faithful to its assertions of budget fidelity between 2016 and 2018.

Guess's contends that funds earmarked for facilities during the 2017-18 school year could not be used for staff salaries. Def. Ex. 9.  Of course not! But that is not an argument for further staff reduction because those funds could not have been used for staff anyway.

The falsity of the district's reason that it could not "afford" to keep plaintiff on the payroll is further shown by the fact that they did keep her; and that they kept Holder and Brewer as well at a cost of $200,000 or more. Further, the district's 'losing money reason was not the reason' given to plaintiff in her notice of dismissal. In any case, both reasons are false! Program needs remained the same, and the district continued to pay  Brewer and Holder more than $200,000 while it tries to justify cutting plaintiff's salary by more than $10,000 after she complained about management adverse treatment of African American staff.

In summary, the district communicated to plaintiff in its discharge letter that her job was being eliminated because of program needs. The pretext of that reason is shown by the fact that both Lynch and Brewer  (*Plaintiff's Exhibit 7- Brewer Dep. pages 22 and Plaintiff's Exhibit 5- Lynch Dep. p. 30-31* ) testified that the program needs of  the position remain necessary and that they changed the title of the job in name only.  *See Exhibits supra.* Describing a dog as a cat does not a cat make. That

is what we have here! A name change where all of the essential work duties remain. Pure pretextual!

A reasonable jury would therefore likely conclude that the reasons asserted for the adverse treatment visited upon plaintiff by the defendant were false and pretexual. Under such circumstances, the jury would be left with plaintiff's direct evidence which shows that her adverse employment action and the contributing actions by district employees was racially motivated. Without a legitimate, nondiscriminatory defense, a verdict should be entered for plaintiff. Because plaintiff's evidence is so strong and substantial, it is likely that at the conclusion of plaintiff's case, the Court will be obliged to hold as a matter of law that judgment should be entered for plaintiff because of defendant's failure of proof.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment must be denied. Plaintiff is entitled to proceed to trial and judgment thereafter.

Respectfully submitted,

John W. Walker
John W. Walker, P.A.
1723 Broadway
Little Rock, Arkansas   72206
501-374-3758
501-374-4187(fax)
Email: johnwalkeratty@aol.com